CIACCIO, Judge.
Defendant Don Thompson was charged with the unlawful killing of Lisa Chaney. La. R.S. 14:31. He was found guilty of manslaughter and sentenced to serve 18 years at hard labor in the custody of the Department of Corrections. Thompson appeals his conviction and sentence relying on one assignment of error. We reverse the conviction and sentence and remand for a new trial.
The record reveals these facts:
On June 8, 1986 Officer Madelyne Baptiste and Joseph Williams responded to a call of a shooting in an apartment in the Desire Project.
Upon entering the apartment the policemen discovered Lisa Chaney barely alive with a gunshot wound to the face. The victim was lying on a bed and the white bed sheets were soiled with the victim’s blood. The defendant was in the room and he had blood stains on his clothing. The defendant explained that his clothes were soiled with blood because he had moved the victim, slightly, in an attempt to help her. A cocked gun was found on the bed and a bullet was found near the pillow. The victim’s slippers, with blood stains on the inside, were found under the bed. An ambulance was summoned to take Ms. Chaney to the hospital. She died shortly thereafter.
The victim’s mother, Ernestine Walker and sister Rose Mary were interviewed at the scene of this incident. Ms. Walker stated that her daughter, Lisa, and the defendant were “friends” and that they had had a child together. On the night of this incident the defendant awakened Ms. Walker and told her to “come see what Lisa done did.”
Rose Mary Chaney, the victim’s sister was in an adjacent apartment and heard a popping sound on the night in question, but it didn’t fully awaken her. She did not hear any arguments prior to this time. She was next awakened when the defendant summoned her after saying that the gun went off as the victim played with it.
In an interview with Officer Pascal Sala-dino, the defendant allegedly reported 2 stories. In the first story Thompson stated that he and the victim had gone to get dinner and she returned to the apartment before him. As Thompson entered the apartment he heard a gunshot and thereafter found the victim. In the second story, Thompson reportedly told Saladino that he had returned from getting food and as he was entering the bedroom the gun discharged.
Since Saladino felt the crime scene was inconsistent with the defendant’s story of a self inflicted wound by the victim, he advised Thompson of his rights and placed him under arrest.
At the trial of this case Dr. Monroe Sam-uels, an expert in forensic pathology, testified that he conducted an autopsy upon the victim. He stated that the gunshot entered Chaney’s face on the right cheek. The bullet went backward, slightly upward and *186 entered the skull causing a laceration of the brain stem. There was no stippling or tattooing around the wound indicating that the wound was not consistent with a close contact wound. He also stated that an examination of the body revealed a bent index finger at the time of autopsy.
The defendant testified at his trial that he and the victim had cohabitated together for 3 years and they had a child during that time. Although they had recently been apart, during which time she had had relations with another man, they were reconciled shortly thereafter and had resumed their relationship prior to the shooting.
Thompson stated that on the night in question he and the victim and the defendant’s brother had been at a barroom from about 11 p.m. until 2 a.m. The truck they were using that night had stalled. After several attempts to start the truck without success, they pushed it to a local service station and caught a cab home. When they reached home it was 4:30 a.m. and defendant’s brother went to his house. Defendant and the victim went to get some chicken and were told it would be 15 minutes before it was cooked so he took Lisa home with an intent to return for the food. The couple each went to the bathroom. As Thompson was leaving to retrieve the chicken, he heard a gunshot. He ran to the bedroom where he found Lisa with a gunshot to the face and his gun in her hand. The gun was still cocked. He removed the gun and slightly moved Lisa in an attempt to make her more comfortable. He thereafter called her mother.
According to the defendant, Lisa had this automatic pistol in her purse that night. It was a gun he had held in pawn. They had taken the gun outside the apartment because he thought he would see its owner and return the gun after being paid the debt he was owed. The defendant’s story was corroborated by his brother who was present with the couple on this night shortly before the shooting.
In his sole assignment of error, the defendant contends that the trial court erred in admitting into evidence testimony of alleged bad acts of the defendant. In conjunction with defendant’s assertion that bad acts evidence was erroneously admitted, he alleges that this testimony of witness Piper Brown was impermissible and highly prejudicial. Additionally, defendant argues that the trial court failed to charge the jury as to the limited purpose of this evidence. We do not consider this argument, however, because of the results reached on the issue of the admissibility of the bad acts evidence.
Evidence of other crimes for which a defendant was not convicted is generally not admissible, because it would often compel the accused to defend against charges of which he has no notice and for which he is unprepared. State v. Prieur, 277 So.2d 126 (La., 1973). Additionally, the admission of such acts would involve substantial risk of grave risk to the defendant by presenting him as having bad character where his character had not been placed at issue. See: State v. Prieur, supra.
Aside from related offenses admissible as part of the res gestae, and convictions admissible for impeachment purposes, there exist three exceptions to this rule of the inadmissibility of such evidence. That is, evidence of other crimes is admissible to prove knowledge, system or intent. La.R. S. 15:445-446. State v. Prieur, supra.
In this case the defendant was charged with the crime of manslaughter which reads in pertinent part:
Sec. 81. Manslaughter
Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed; or
*187 (2) A homicide committed, without any intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Articles 30 or 30.1, or of any intentional misdemean- or directly affecting the person;
* * * * * ⅜
The record reveals that on the day prior to trial, the State presented the defendant with written notice of its intent to introduce evidence “of similar acts of defendant to prove knowledge, system and intent”. State v. Prieur, supra. According to the notice, the state advised the defendant that he was charged with manslaughter which resulted when he was engaged in the perpetration of an intentional misdemeanor directly affecting the person. La.R.S. 14:31(2). The state alleged that this evidence of similar acts was probative of the issue of guilty knowledge and intent.
At the Prieur hearing, Piper Brown testified, as she did at trial, that on the Thursday before Chaney’s death, three days before the shooting, she was in the company of the defendant and the victim. At the time, the trio had met at a bar where they were playing pool. The victim and defendant were not drinking at the time. All three left the bar and were walking home when they stopped to get a beer. Thereafter, the defendant pointed a large gun in the victim’s face and asked why the victim did not buy him a beer. She told him she did not have the money. There was no altercation either before or after this incident. The defendant thereafter put the revolver in his pants. The trial judge ruled that this evidence was admissible for the following reasons:
BY THE COURT:
Well then it doesn’t fit the manslaughter statute, other than directly affecting the other person. If the theory of the State that Mr. Thompson was threatening Miss Chaney, the victim, with the gun, and the gun was charged, you would have a manslaughter charge as to a misdemeanor directly affecting the person, of course this would fit in to show prior threat or a prior misdemeanor. I am going to allow it in under that theory.
The defendant filed an objection to the ruling of the court.
On appeal, the state argues that the evidence was correctly admitted at trial and its probative value outweighed the prejudicial effect. We disagree.
In this case the defendant was charged with manslaughter. Although the State argued at the Prieur hearing that the defendant intended to kill the victim and the State was proceeding under this section of the manslaughter statute (i.e., La.R.S. 14:30(1)), there was no evidence of this intent at the hearing or at trial. At the Prieur hearing the trial judge based his decision to admit the evidence on his conclusion that that the defendant was being prosecuted under subsection 2 of the manslaughter statute which defines this crime as an unintentional killing. La.R.S. 14:30(2).
The Louisiana Supreme Court, in State v. Humphrey, 381 So.2d 813 (La., 1980) held that specific intent to kill or cause great bodily harm is not an element of the crime when the defendant is charged under subsection 2 of the manslaughter statute. As such, intent is not an issue in dispute. Accordingly, the testimony regarding the defendant’s alleged bad acts was inadmissible for the purpose of proving knowledge or intent.
Although the State argues that the bad acts evidence is admissible under the holding of State v. Qualls, we find that case distinguishable from the present. 353 So. 2d 978 (La., 1978). In Qualls, supra, unlike this case, the defendant was charged with attempted first degree murder, not manslaughter. Since attempted first degree murder is a crime in which specific intent is an element, evidence of other bad acts could be admissible to prove intent, provided all other criteria for admissibility is met. As previously discussed, under the section of the manslaughter statute with which defendant is charged, specific intent is not an element of the crime. Hence the other bad acts evidence to prove intent is not admissible.
*188 Moreover, contrary to the State’s assertion that this incident constituted a “similar” act, and would be probative of “system”, the act in question does not meet the test of distinctive similarity. State v. Humphrey, supra; State v. Showers, 359 So.2d 104 (La., 1978). That is, the earlier bad act, if in fact it occurred, was an assault, that is, a crime of attempting to commit a battery or of placing another in reasonable apprehension of receiving a battery. The instant crime is one of a killing in which there is no evidence whatsoever that the victim was placed in apprehension of receiving a battery. Additionally there is no evidence that the defendant first threatened the victim with a gun. The evidence was apparently offered to show that the defendant had displayed animosity towards the victim (i.e., his bad character) and the evidence was inadmissible for this purpose. The evidence was highly prejudicial and clearly affected the jury’s deliberations and finding of guilt.
There was no proof of ill feelings between the parties on the night in question. The victim allegedly had been carrying the gun that night and was not experienced with automatic weapons of this kind. No tests were run on the hands of the victim or the defendant to determine if either had fired the gun. Although there was hearsay testimony that no fingerprints were found on the gun, no expert testified that the crime lab in fact tested the gun for fingerprints. The gun was found under the victim and in a cocked position. The victim’s index finger was bent even at the time of autopsy. The defendant’s clothes were covered with blood and there was no expert testimony presented to prove the blood could not have gotten on his clothes as explained by the defendant (when he moved the victim for her comfort). The incriminating evidence against the defendant, all of which was circumstantial, together with defendant’s conflicting stories, neither of which was an admission of guilt, may have caused a jury to conclude, absent the prejudicial testimony, that there was a reasonable hypothesis of innocence, i.e., (1) accidental death at the victim’s hands; (2) accidental death at the defendant’s hands or (3) accidental death at the defendant’s hands under circumstances that constituted negligent homicide.
The trial court erred in admitting this evidence and this error was not harmless.
Accordingly, for the reasons stated the defendant’s conviction and sentence are reversed and the case is remanded for a new trial.
REVERSED.